UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| JOHN AMIRAULT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | CIVIL ACTION |
| | ) | NO.  16-10158-JGD |
| CITY OF MALDEN and KEVIN MOLIS, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OF DECISION AND ORDER
## ON DEFENDANT KEVIN MOLIS' MOTION TO DISMISS

March 20, 2017

DEIN, U.S.M.J.

### I. INTRODUCTION

The plaintiff, John Amirault ("Amirault"), has been employed by the City of Malden,

Massachusetts ("Malden" or the "City") for 36 years, and has served as an officer in the Malden

Police Department for 31 of those years.  On October 7, 2015, Amirault was involuntarily

removed from his position as the head of the Department's Detective Unit, and was assigned to

serve as the Police Department's newly created Manager of Accreditation.  The plaintiff claims

that the reassignment deprived him of the ability to earn overtime pay, and that it occurred in

retaliation for statements he had made during the course of two separate investigations in

which Amirault uncovered evidence of possible misconduct by City officials.  By his Complaint in

this action, Amirault has asserted claims against Malden's Chief of Police, Kevin Molis ("Molis"),

pursuant to 42 U.S.C. § 1983 ("Section 1983") and the Massachusetts Civil Rights Act, Mass.

Gen. Laws ch. 12, § 11I ("MCRA"), for violating his First Amendment right to free speech

(Counts I and III).  He has also asserted a claim against the City for violations of the

Massachusetts Whistleblower Act, Mass. Gen. Laws ch. 149, § 185 (Count II).

The matter is before the court on "Defendant Kevin Molis' Motion to Dismiss" (Docket

No. 13), by which Molis is seeking dismissal of Counts I and III on the grounds that they fail to

state a plausible claim for relief pursuant to Fed. R. Civ. P. 12(b)(6).  Specifically, Molis argues

that Amirault cannot sustain a claim under Section 1983 or the MCRA because he has failed to

allege facts showing that his reassignment to the Accreditation Manager position occurred in

retaliation for engaging in constitutionally protected speech.  Molis also argues that Amirault's

MCRA claim must fail because the plaintiff has not alleged facts showing that the defendant's

conduct involved threats, intimidation or coercion.  Finally, Molis contends that even if Amirault

has alleged a violation of his constitutional rights, his claims should be dismissed on the

grounds of qualified immunity.

The threshold issue raised by the defendant's motion is whether Amirault's statements

regarding potential misconduct by City officials are entitled to protection under the First

Amendment.  Pursuant to the Supreme Court's seminal decision in <u>Garcetti v. Ceballos</u>, 547 U.S.

410, 126 S. Ct. 1951, 164 L. Ed. 2d 689 (2006), Amirault's speech would only be protected if, at

the time he made the statements at issue, he was speaking as a citizen on a matter of public

concern rather than pursuant to his official duties as head of the Malden Police Department's

Detective Unit.  As described below, this court finds that Amirault has failed to allege that he

was speaking as a citizen instead of a public employee.   Therefore, and for all the reasons

2

detailed herein, the defendant's motion is ALLOWED, and Counts I and III of the plaintiff's Complaint shall be dismissed.

## II. STATEMENT OF FACTS

When ruling on a motion to dismiss brought under Fed. R. Civ. P. 12(b)(6), the court must accept as true all well-pleaded facts, and give the plaintiff the benefit of all reasonable inferences.  See Cooperman v. Individual Inc., 171 F.3d 43, 46 (1st Cir. 1999).  Applying this standard to the instant case, the relevant facts are as follows.

### Amirault's Employment as Head of the Detective Unit

As described above, the plaintiff, Amirault, was employed for 31 years as a law enforcement officer for the City of Malden.  (Compl. (Docket No. 1) ¶ 4).  Beginning in 2012, Amirault served as head of the Malden Police Department's Detective Unit.  (Id.).  This case arises out of his involuntary transfer from that position to the newly created position of Manager of Accreditation on October 1, 2015.  (Id.).  Amirault claims that the transfer violated his rights under the First Amendment because it was done in retaliation for constitutionally protected speech.

In his capacity as head of the Detective Unit, Amirault was responsible for all investigations of significant major crimes that had taken place within the City of Malden.  (Id. ¶ 5). During his last year of employment in the Police Department's Detective Unit, Amirault became heavily involved in the investigation of two separate criminal matters, which will be referred to herein as the "Enos Henry matter" and the "YMCA investigation."  (See id. ¶ 6).  According to the plaintiff, the first matter involved the theft of City funds by a Malden Building Department Clerk named Enos Henry.  (See id. ¶¶ 6, 9).  The second matter involved the alleged sexual

assault of a six-year old child at the Malden YMCA, where Molis' brother, Frank Molis ("Frank"), was employed in a supervisory capacity. (Id. ¶ 6). Amirault claims that "[t]hroughout the investigation of these two cases, it became evident to the [p]laintiff that his efforts to investigate these cases were being hampered and obstructed by officials within the City of Malden in an effort to protect those directly and indirectly involved." (Id. ¶ 7). He further claims that his involuntary removal from his position as head of the Detective Unit was motivated by complaints he made regarding the efforts of City employees to interfere in or otherwise undermine the investigations. (Id. ¶¶ 69-70).

**The Enos Henry Matter**

The Enos Henry matter involved the alleged theft of funds from the City of Malden by an employee of the Malden Building Department, Enos Henry ("Henry"). The matter first came to light on or about November 17, 2014, when a $2,236 check was reported stolen from the Building Department. (Id. ¶ 8). The check was made out to the City of Malden, and was submitted to the Department by a local contractor in connection with an application for a building permit. (Id. ¶¶ 8-9). It was last seen, along with the application, on Henry's desk. (Id. ¶ 9). After reviewing the circumstances surrounding the theft of the check, Amirault decided to launch an investigation. (Id.). The plaintiff was both responsible for, and took part in, the investigation. (Id. ¶¶ 10-18).

During the investigation, Amirault uncovered evidence implicating Henry in the theft of the check. In particular, he learned that the check had been cashed on November 8, 2014 by a woman named Jennifer Degand Rene. (Id. ¶ 13). Ms. Rene was later arrested and interviewed by the police. (Id. ¶¶ 13-14). In the course of the interview, Ms. Rene confessed that Henry

4

had altered the check to make it payable to her, and then had driven her to the bank in order to cash it.  (Id. ¶ 14).  She also admitted that Henry had paid her $1,200 after the check was cashed.  (Id.).

The plaintiff claims that on or about February 2, 2015, defendant Molis asked Amirault to meet with him.  (Id. ¶ 15).  The Mayor of Malden, Gary Christenson, attended the meeting as well.  (Id.).  At the meeting, the plaintiff described the status of the Enos Henry investigation. (Id. ¶ 16).  He also indicated that he would be willing to speak to the Middlesex District Attorney's Office about offering Ms. Rene a plea bargain if she would agree to testify against Henry.  (Id. ¶ 17).  According to Amirault, neither Molis nor Mayor Christenson seemed interested in his proposal, and they both raised questions about the strength of the evidence against Henry.  (Id.).  The plaintiff suggests that Molis' and the Mayor's skepticism toward the investigation was due to the fact that Henry's mother was an active political supporter of Mayor Christenson.  (See id. ¶ 31).

Thereafter, Amirault appeared before the Malden City Council, in executive session, to report on his findings with respect to the Enos Henry matter.  (Id. ¶ 18).  During his presentation, the plaintiff allegedly expressed concern about the possibility that additional funds might be missing from the Building Department.  (Id.).  The plaintiff's concerns were based on an apparent discrepancy between the amount of money that had been spent on building permits since the start of his investigation, and the amount that had been spent on permits during the prior calendar year.  (Id.).  As described below, the plaintiff's suspicions turned out to be correct.

On February 3, 2015, Henry was interviewed at the Malden Police Station regarding the alleged theft of the $2,236 check. (Id. ¶ 19).  Allegedly, Henry made numerous inconsistent and inculpatory statements throughout the course of the interview. (Id.).  Four days later, the police conducted a search of Henry's home, where they allegedly discovered 75 checks made out to the City of Malden for building permits, two payroll checks made out to two different City employees, and three high capacity magazines for an AR-15 style rifle. (Id. ¶ 20).  Amirault claims that Henry was present during the search, and attempted to remove evidence. (Id. ¶ 21).  As a result, Henry was arrested for interfering with an investigation. (Id.).

Following the search of Henry's home, and with the urging of the plaintiff and the Malden City Solicitor, the City hired the independent accounting firm of Blum-Shapiro to conduct a review of all building permits issued between May 1, 2013 and March 1, 2015, and to determine whether additional payments were missing from the Building Department. (Id. ¶ 22).  The plaintiff claims that City employees were uncooperative with Blum-Shapiro's effort to carry out its investigation. (See id. ¶¶ 23, 25).  In particular, Amirault alleges that Blum-Shapiro made several requests for reports from the City's IT Director regarding the issuance of building permits and payments to the City. (Id. ¶ 23).  However, the only information Blum-Shapiro received from the IT Director consisted of two "unidentifiable and contradictory" Excel reports. (Id.).

Amirault contends that City employees were also uncooperative with a Middlesex Grand Jury's effort to obtain information relating to the Enos Henry matter.  Specifically, Amirault claims that on April 16, 2015, the Grand Jury issued a subpoena to the City, which sought "all records and information relating to building permits issued by the City of Malden" between

October 1, 2014 and January 31, 2015.  (Id. ¶ 24).  While the Malden Comptroller's Office produced records that were in its possession, the City Treasurer allegedly indicated that no further documents were available.  (Id.).  According to the plaintiff, "[t]his information was later determined to be false."  (Id.).  Thus, Amirault suggests that the City failed to take the steps necessary to insure that all responsive documents had been produced.

On June 8, 2015, Amirault attended a meeting with the City Solicitor, Kathryn Fallon, Assistant District Attorney Craig Estes ("ADA Estes"), and the Forensic Auditor for the Middlesex District Attorney's Office, Sean Ball, to address the impediments to Blum-Shapiro's investigation.  (Id. ¶ 26).  During the meeting, Amirault allegedly criticized the City Treasurer's office, as well as the City's failure to produce relevant records.  (Id. ¶ 27).  There is no indication that Amirault participated in the meeting in any capacity other than as head of the Detective Unit of the Malden Police Department.  Nor is there any indication that his participation exceeded the scope of his job responsibilities.

 Allegedly, Blum-Shapiro provided a list of documents that it believed were necessary to determine whether additional funds had been stolen from the Building Department.  (Id. ¶ 28). City Solicitor Fallon then went to the Building Department and pulled the records herself.  (Id.). The records were reviewed by Amirault and other members of the Detective Unit.  (Id.). Amirault claims that as a result of the review, he determined that less than 5% of the City's building permit records had been properly recorded or accounted for.  (Id.).

Amirault met with ADA Estes and Mr. Ball again on October 6, 2015, and showed them relevant records, as well as information that he was able to compile from those records .  (Id. ¶ 30).  The plaintiff claims that during this meeting, he expressed his displeasure with the lack

of cooperation and support he received from City of Malden officials.  (Id.).  Again, however,

there is no indication that Amirault attended the meeting in any capacity other than in his

capacity as head of the Detective Unit and an employee of the Malden Police Department, or

that his participation was outside the scope of his job responsibilities.

The plaintiff claims that the City's failure to produce the records necessary to investigate

the theft of funds from the Building Department caused a delay in the criminal proceedings.

(Id. ¶ 32).  Consequently, no criminal charges had been brought against Henry at the time

Amirault filed his Complaint in this case.  (Id.).

### The YMCA Investigation

In April 2015, while the Enos Henry matter remained ongoing, Amirault also became

involved in the investigation of a sexual assault of a six-year old girl, which had taken place at

the Malden YMCA on April 4, 2015.  (Id. ¶ 33; see also id. ¶ 55).  Molis' brother, Frank, worked

at the YMCA in a supervisory capacity, and was present at the facility on the day of the alleged

assault.  (Id. ¶¶ 6, 35).  Certain areas of the YMCA are monitored by surveillance videotape, and

after police officers responded to the alleged assault, they began to review the videotape in the

hope of collecting evidence of the incident and identifying the unknown assailant.  (Id. ¶ 34).

Amirault claims that the surveillance tape contained evidence of the alleged assault,

including a clear image of the suspected perpetrator, who was identified as a young Asian male.

(Id. ¶ 36).  He also claims that Frank Molis was present when the police reviewed the relevant

portions of the videotape, and was able to view the footage of the suspect as well.  (Id. ¶ 38).

No one who saw the surveillance tape, including Frank Molis, indicated having any knowledge

of or familiarity with the suspect.  (Id. ¶¶ 36, 38).  According to Amirault, however, he later

learned that Frank Molis not only knew the suspect's identity, but had also been responsible for hiring the suspect to perform work at the YMCA.  (Id. ¶¶ 49-51).

In order to expedite efforts to identify and locate the perpetrator of the alleged sexual assault, Amirault contacted the head of the Child Abuse Unit at the Middlesex District Attorney's Office, Katherine Folger ("ADA Folger"), and recommended that she distribute the suspect's photograph to the electronic media.  (Id. ¶ 39).  ADA Folger agreed, and the plaintiff delivered a copy of the surveillance videotape to the District Attorney's Office in Woburn.  (Id.). However, when Amirault returned to the police station, he allegedly learned that the defendant, Kevin Molis, had been making inquiries regarding the progress of the YMCA investigation, and seemed agitated about the lack of any available information.  (Id. ¶ 40).  Accordingly, Amirault met with Molis and informed him of the strategy to distribute the suspect's photograph to the local media.  (Id. ¶ 41).  The plaintiff alleges that Molis instructed him not to disseminate the suspect's photograph, but rather to "work the case in house" instead.  (Id. ¶ 42).  He also alleges that Molis called ADA Folger, and convinced her to withhold the suspect's photograph from the media.  (Id. ¶¶ 42-43).

Subsequently, Amirault's subordinates in the Malden Detective Unit conducted interviews of two YMCA employees who were working at the front desk on the morning of the alleged sexual assault.  (Id. ¶ 44).  The defendant, who had allegedly arrived at the YMCA unannounced, sat with the detectives as they performed the interviews.  (Id.).  Molis' brother Frank also was present for the interviews.  (Id.).  As part of their investigation, the detectives had the two employees review the portions of the surveillance videotapes that had captured

the unidentified assailant.  (Id. ¶ 45).  Although Frank allegedly was present when the video-
tapes were reviewed, he gave no indication that he knew the suspect's identity.  (Id. ¶ 46).

Upon review of the surveillance tapes, one of the YMCA employees stated that the
suspect "comes in here all the time," and had been visiting the facility for a "couple of years,"
but was unable to recall his name.  (Id. ¶ 47).  Later that night, Amirault received a call from the
defendant, Kevin Molis.  (Id.).  Molis allegedly advised the plaintiff that the YMCA employee
had been able to remember the suspect's name, and that the suspect was a 15-year old high
school student.  (Id.).  However, the defendant allegedly said nothing about a pre-existing
relationship between the suspect and his brother Frank.  (Id.).

After learning the name of the suspect, Amirault resumed his investigation.  Thus, the
plaintiff met with the suspect's father and showed him the photograph that had been taken
from the YMCA surveillance video.  (Id. ¶ 48).  The father identified the individual shown in the
photograph as his son, and agreed to accompany the suspect to the police station for an inter-
view.  (Id.).  Amirault then arranged for the suspect to be taken to the Malden police station,
along with his father, where the suspect was interviewed by two detectives in Amirault's unit.
(Id. ¶¶ 48-49).  Allegedly, during the interview, the suspect stated that he had been at the
YMCA on the day of the assault because he had been hired to move furniture for Frank Molis.
(Id. ¶ 49).  He also stated that he had been going to the facility for a few years because Frank
Molis had hired him to work there as a volunteer, that he had spoken to Frank on the day of the
alleged assault, and that he had performed a lot of work for Mr. Molis for which he had been
paid.  (Id. ¶¶ 50-51).  Amirault claims that the suspect's father agreed with these statements.
(Id. ¶ 51).

Amirault alleges that the initial portion of the interview was captured by video and audio recording, but that the recording was terminated from outside the interview room when the detectives began to question the suspect about his relationship with Frank Molis. (Id. ¶ 52). As a result, that portion of the interview has not been preserved. (Id.). Amirault has not identified who was responsible for terminating the recording.

On April 8, 2015, Amirault instructed one of the detectives to go to the YMCA in order to establish time offsets for the surveillance tapes from the day of the alleged sexual assault, and to retrieve the video from all of the cameras that were located in the building. (Id. ¶ 53). Allegedly, Frank Molis told the detective that the YMCA was in the process of switching out its servers at the request of its insurance company. (Id.). Later that month, Amirault allegedly learned that the police might not have recovered all of the surveillance video from the date of the alleged sexual assault. (Id. ¶ 54). Accordingly, the plaintiff and a second detective returned to the YMCA to seek additional information. (Id.). During his visit, Amirault met with Frank Molis and requested that he turn over to the Malden police any of the servers that had captured video of the suspect on April 4, 2015. (Id. ¶ 55). Frank allegedly stated that he would need to consult with his attorney before he could comply with the request. (Id.). According to Amirault, he also asked Frank if he knew the suspect personally, and Frank stated that he did not. (Id. ¶ 56).

The plaintiff alleges that after informing the attorney for the YMCA of his intention to obtain a search warrant, the servers were turned over to Malden Police Department and then forwarded to the Middlesex District Attorney's Office. (Id. ¶ 57). In June 2015, Amirault received a copy of the video from the YMCA servers, and he instructed one of the police cadets

to review the relevant tapes to see where the suspect had gone after he entered the YMCA. (Id. ¶ 58).  After reviewing the available material, the cadet allegedly informed the plaintiff that she had seen the videotape of the suspect entering the YMCA and approaching the front coun-ter at the time the tapes were first produced by Frank Molis, and that the camera angle from those tapes was not included in the video that had been obtained from the server.  (Id. ¶ 59). Thus, Amirault suggests that someone – possibly Frank Molis – redacted a portion of the video.

On July 14, 2015, Amirault met with ADA Folger in order to request that the District Attorney's Office expedite the processing of the surveillance video from the YMCA.  (Id. ¶ 60). The plaintiff claims that during the course of that meeting, he told ADA Folger about the conflicting statements from the sexual assault suspect and Frank Molis as to whether the two knew each other.  (Id.).  Two days later, the Middlesex District Attorney's Office informed Amirault that the case was being transferred to Norfolk County due to the potential conflict of interest arising from the family relationship between the defendant and his brother Frank.  (Id. ¶ 61).  On August 3, 2015, Amirault and a second detective met with one of the Norfolk County ADAs and two members of the Massachusetts State Police for the Norfolk County C-PAC Unit in order to provide them with all of the information they had gathered in the course of the YMCA Investigation.  (Id. ¶ 62).  This included information about the alleged inconsistencies in the statements that had been made by Frank Molis and the sexual assault suspect.  (Id.).

### Amirault's Reassignment

On October 7, 2015, defendant Molis allegedly informed Amirault that he wanted the Police Department to move toward accreditation, and that he was transferring the plaintiff to a full time accreditation position effective as of November 1, 2015.  (Id. ¶ 63).  According to

Amirault, Molis advised him that once he had been reassigned, the plaintiff would be expected to work on accreditation and "nothing else." (Id. ¶ 64). Amirault claims that he had earned significant overtime pay while carrying out his duties as the head of the Detective Unit, and that Molis knew that the transfer to accreditation would effectively prevent the plaintiff from earning any overtime pay. (Id. ¶ 65). Thus, Molis allegedly was aware that the move would result in a significant loss of income for the plaintiff. (Id.). Amirault also claims that during his conversation with Molis, he expressed his belief that the defendant's decision was "personal," thereby suggesting that it had been made in retaliation for his involvement in the Enos Henry matter and the YMCA investigation. (Id. ¶ 64). Nevertheless, on November 1, 2015, Amirault was involuntarily removed from his position as head of the Detective Unit and transferred to the newly created position of Accreditation Manager. (Id. ¶ 66).

The plaintiff alleges that in the fifteen years prior to the filing of his lawsuit, there were only four instances when a detective was transferred involuntarily out of the Detective Unit, and three of those instances involved egregious misconduct by the officer in question. (Id. ¶ 67). He also alleges that there was no reason for his reassignment to the accreditation position other than to silence him and prevent his further involvement in the Enos Henry matter and the YMCA investigation. (Id. ¶ 70). On November 18, 2015, Amirault notified the defendants, in writing, of his claim that his removal from his position as head of the Detective Unit occurred in retaliation for his involvement in those two investigations, and for statements that he made about the City's and its employees' roles in those matters. (Id. ¶ 68 & Ex. A). He filed the instant lawsuit against the City and Molis on February 2, 2016.

Additional factual details relevant to this court's analysis are set forth below where appropriate.

### III.  ANALYSIS

### A.    Standard of Review

Molis has moved to dismiss Amirault's claims against him, pursuant to Fed. R. Civ. P. 12(b)(6), for failure to state a claim for relief.  Motions to dismiss under Rule 12(b)(6) test the sufficiency of the pleadings.  Thus, when confronted with such a motion, the court accepts as true all well-pleaded facts and draws all reasonable inferences in favor of the plaintiff.  See Cooperman, 171 F.3d at 46.  Dismissal is only appropriate if the complaint, so viewed, fails to allege "a plausible entitlement to relief."  Rodriguez-Ortiz v. Margo Caribe, Inc., 490 F.3d 92, 95 (1st Cir. 2007) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 559, 127 S. Ct. 1955, 1967, 167 L. Ed. 2d 929 (2007)).

"The plausibility inquiry necessitates a two-step pavane."  Garcia-Catalan v. United States, 734 F.3d 100, 103 (1st Cir. 2013).  "First, the court must distinguish 'the complaint's factual allegations (which must be accepted as true) from its conclusory legal allegations (which need not be credited).'"  Id. (quoting Morales-Cruz v. Univ. of P.R., 676 F.3d 220, 224 (1st Cir. 2012)).  "Second, the court must determine whether the factual allegations are sufficient to support 'the reasonable inference that the defendant is liable for the misconduct alleged.'"  Id. (quoting Haley v. City of Boston, 657 F.3d 39, 46 (1st Cir. 2011)) (additional citation omitted).  This second step requires the reviewing court to "draw on its judicial experience and common sense."  Id. (quoting Ashcroft v. Iqbal, 556 U.S. 662, 679, 129 S. Ct. 1937, 1950, 173 L. Ed. 2d 868 (2009)).  "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need

14

detailed factual allegations," the plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Bell Atl., 550 U.S. at 555, 127 S. Ct. at 1964-65 (citations omitted).  Accordingly, the factual allegations "must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Id. at 555, 127 S. Ct. at 1965 (citations omitted).  For the reasons set forth below, this court finds that Amirault has failed to state a plausible claim for relief against Molis.

### B.      Count I: Claim Against Molis Under Section 1983

In Count I of his Complaint, Amirault is seeking to hold Molis liable, pursuant to Section 1983, for violations of his First Amendment right to engage in free speech.  Specifically, Amirault claims that Molis retaliated against him, by removing him from the Detective Unit and reassigning him to the Accreditation Manager position, for statements that Amirault made in connection with his involvement in the Enos Henry matter and the YMCA investigation.  (See Compl. ¶ 69).  "A claim under section 1983 has two essential elements.  First, the challenged conduct must be attributable to a person acting under color of state law" and "second, the conduct must have worked a denial of rights secured by the Constitution or by federal law." Soto v. Flores, 103 F.3d 1056, 1061 (1st Cir. 1997).  For purposes of the defendant's motion, there is no dispute that Molis was acting under color of state law at all relevant times.  At issue is whether his alleged conduct in transferring Amirault from the Detective Unit to the accreditation position in retaliation for Amirault's statements violated the plaintiff's rights

under the First Amendment.[1]  Because Amirault has failed to allege that he engaged in consti-

tutionally protected speech, this court finds that Count I of his Complaint must be dismissed.

### Elements of a First Amendment Retaliation Claim

"It is well settled that 'as a general matter the First Amendment prohibits government

officials from subjecting an individual to retaliatory actions . . . for speaking out.'"  Decotiis v.

Whittemore, 635 F.3d 22, 29 (1st Cir. 2011) (quoting Mercado-Berrios v. Cancel-Alegria, 611

F.3d 18, 25-26 (1st Cir. 2010)) (additional citation omitted).  In the public employment context,

however, this right is not unlimited.  As the Supreme Court explained in Garcetti v. Ceballos,

547 U.S. 410, 418, 126 S. Ct. 1951, 1958, 164 L. Ed. 2d 689 (2006), "[w]hen a citizen enters

---

[1] In support of his claim under Section 1983, Amirault alleges that "Defendant Kevin Molis, *in his official capacity*, and under color of law, attempted to interfere with, and interfered with Plaintiff's constitutional right of free speech as guaranteed by the First Amendment to the United States Constitution and Article 16 of the Massachusetts Constitution[.]"  (Compl. ¶ 72 (emphasis added)).  Nevertheless, both parties have proceeded on the assumption that Molis has been sued in his individual capacity.  As described above, this court finds that Amirault has failed to state a Section 1983 claim against Molis in his individual capacity.  To the extent Amirault intended to assert a Section 1983 claim against Molis in his official capacity, any such claim must fail as well.  "[O]fficial-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent."  McGuigan v. Conte, 629 F. Supp. 2d 76, 82 (D. Mass. 2009) (quoting Hafer v. Melo, 502 U.S. 21, 25, 112 S. Ct. 358, 116 L. Ed. 2d 301 (1991)).  Accordingly, an official capacity claim against Molis constitutes another way of asserting a Section 1983 claim against the City of Malden.  "It is well established that a municipality is not liable for the tortious actions of its employees simply by virtue of the employment relationship."  McElroy v. City of Lowell, 741 F. Supp. 2d 349, 353 (D. Mass. 2010).  "Instead, to establish municipal liability, 'a plaintiff must show that a policy or custom of the city led to the constitutional deprivation alleged.'"  Id. (quoting Santiago v. Fenton, 891 F.2d 373, 381 (1st Cir. 1989)).  In this case, Amirault has not alleged the existence of a policy or custom that led to the alleged violation of his First Amendment rights.  Nor can a municipal policy or custom be inferred from the facts alleged.  See id. at 354 ("While the existence of a municipal custom may be evidenced by the repetition of unlawful acts by [police] officers, a single instance of police misconduct in the field, standing alone, is insufficient to establish the endorsement of an informal policy or custom by the City.").  Therefore, even if Amirault intended to assert an official capacity claim against Molis under Section 1983, his claim could not withstand the defendant's motion to dismiss.

government service, the citizen by necessity must accept certain limitations on his or her

freedom." This is because

> [g]overnment employers, like private employers, need a significant
> degree of control over their employees' words and actions; without it,
> there would be little chance for the efficient provision of public services.
> Public employees, moreover, often occupy trusted positions in society.
> When they speak out, they can express views that contravene govern-
> mental policies or impair the proper performance of governmental
> functions.

Garcetti, 547 U.S. at 418-19, 126 S. Ct. at 1958 (internal citation omitted). Consequently, "a

governmental employer may impose certain restraints on the speech of its employees,

restraints that would be unconstitutional if applied to the general public." Davignon v.

Hodgson, 524 F.3d 91, 100 (1st Cir. 2008) (quoting City of San Diego v. Roe, 543 U.S. 77, 80, 125

S. Ct. 521, 523, 160 L. Ed. 2d 410 (2004)) (alteration omitted).

The Supreme Court has identified a two-step initial inquiry "to guide interpretation of

the constitutional protections accorded to public employee speech." Garcetti, 547 U.S. at 418,

126 S. Ct. at 1958. The first step of the initial inquiry "requires determining whether the

employee spoke as a citizen on a matter of public concern. If the answer is no, the employee

has no First Amendment cause of action based on his or her employer's reaction to the

speech." Id. (internal citation omitted). Thus, "*Garcetti* recognizes that this first step itself has

two subparts: (a) that the employee spoke as a citizen and (b) that the speech was on a matter

of public concern." Curran v. Cousins, 509 F.3d 36, 45 (1st Cir. 2007). The plaintiff must satisfy

both subparts to qualify for protection under the First Amendment. See Foley v. Town of

Randolph, 598 F.3d 1, 5 (1st Cir. 2010) ("If the answer to either of these sub-parts is no, then

[the plaintiff] has no First Amendment claim based on the Defendants' action in relation to his

speech.").

 If the answer to the first step of the initial inquiry is yes, "then the possibility of a First

Amendment claim arises" and the second step of the initial inquiry will come into play.

Garcetti, 547 U.S. at 418, 126 S. Ct. at 1958.   Under such circumstances,

> [t]he question becomes whether the relevant government entity had an
> adequate justification for treating the employee differently from any
> other member of the general public.  This consideration reflects the
> importance of the relationship between the speaker's expressions and
> employment.  A government entity has broader discretion to restrict
> speech when it acts in its role as employer, but the restrictions it imposes
> must be directed at speech that has some potential to affect the entity's
> operations.

Id. (internal citation omitted).  Accordingly, "[i]f a court finds the employee has made

statements that are within the scope of First Amendment protection, the court must then

'balance . . . the interests of the [employee], as a citizen, in commenting upon matters of public

concern and the interest of the State, as an employer, in promoting the efficiency of the public

services it performs through its employees.'"  Curran, 509 F.3d at 44 (quoting Pickering v. Bd. of

Educ., 391 U.S. 563, 568, 88 S. Ct. 1731, 20 L. Ed. 2d 811 (1968)).

 In the instant case, Molis argues that Amirault's First Amendment retaliation claim must

fail because the plaintiff was speaking in his capacity as a public employee, rather than as an

ordinary citizen, at all relevant times.  (Def. Mem. (Docket No. 14) at 5-8).  Thus, while Molis

does not dispute for purposes of his motion that Amirault's speech involved a matter of public

concern, he contends that the plaintiff's speech is not entitled to protection under the First

Amendment because "it was made in the context of his job responsibilities as head of the

Detective Unit."  (Id. at 5).   The defendant's argument presents an issue of law, which must be

resolved by the court.  Curran, 509 F.3d at 45 ("it is the judge who decides as a matter of law

the issues in the two steps Garcetti identifies").  Because Amirault's allegations establish that

he was speaking in his capacity as head of the Detective Unit at all times relevant to this action,

this court finds that his speech was not protected by the First Amendment, and that his claim

against Molis under Section 1983 must be dismissed.

### Nature of Amirault's Speech

"In Garcetti, the Supreme Court held that public employees do not speak as citizens

when they 'make statements pursuant to their official duties,' and that accordingly, such

speech is not protected by the First Amendment."  Decotiis, 635 F.3d at 30 (quoting Garcetti,

547 U.S. at 421, 126 S. Ct. at 1960).  However, the Supreme Court has since clarified that the

mere fact that an individual's speech "relates to public employment" or "concerns information

acquired by virtue of his public employment does not transform that speech into employee –

rather than citizen – speech."  Lane v. Franks, 134 S. Ct. 2369, 2379, 189 L. Ed. 2d 312 (2014).

Instead, as the Court explained, "[t]he critical question under Garcetti is whether the speech at

issue is itself ordinarily within the scope of an employee's duties, not whether it merely

concerns those duties."  Id.

In order to determine whether Amirault's alleged speech was made pursuant to his

ordinary duties as head of the Detective Unit, this court "must take a hard look at the context

of the speech."  Decotiis, 635 F.3d at 32.  While the First Circuit has emphasized that "no one

contextual factor is dispositive," it has set forth a list of non-exclusive factors to guide courts in

their evaluation.  Id.  Those factors include:

> whether the employee was commissioned or paid to make the speech in
> question; the subject matter of the speech; whether the speech was

made up the chain of command; whether the employee spoke at [his] place of employment; whether the speech gave objective observers the impression that the employee represented the employer when [he] spoke (lending it "official significance"); whether the employee's speech derived from special knowledge obtained during the course of [his] employment; and whether there is a so-called citizen analogue to the speech.

Id. (internal citations omitted). Ultimately, however, "the proper inquiry is practical rather than formal, focusing on the duties an employee actually is expected to perform, and not merely those formally listed in the employee's job description." Id. at 31 (quotations and citations omitted).

In this case, Amirault's own allegations establish that all of the relevant speech occurred in the context of carrying out his duties as head of the Detective Unit. Thus, the plaintiff alleges that in his role as head of the Detective Unit, he "had essential control over all of the significant major crimes and investigations that occurred within the City of Malden." (Compl. ¶ 5). Accordingly, Amirault was not only involved in, but was also in charge of, the investigation of the Enos Henry matter and the YMCA investigation. (See id. ¶¶ 6-7). His statements regarding these investigations, including his complaints about the lack of cooperation and interference by City employees, as well as his comments about Frank Molis' role in the YMCA matter, were based on knowledge he obtained during the course of his employment, and were conveyed under circumstances that would not involve ordinary citizens. Therefore, they would best be characterized as official communications.

With respect to the Enos Henry matter, Amirault claims that he "appeared before the Malden City Council, in executive session, to report his findings regarding the investigation of Henry." (Id. ¶ 18). During that meeting, Amirault allegedly "expressed his concerns regarding

the possibility of additional missing funds from the Building Department based upon an examination of the difference of money spent on City of Malden building permits in the previous year (2014) and after Plaintiff's investigation had begun." (Id.).  To the extent the plaintiff contends that Molis retaliated against him for the statements he made to the City Council, it is clear from the alleged context of the statements that the plaintiff was carrying out his duties as head of the Detective Unit.  The meeting was held so that Amirault could report his findings to the City.  Thus, the City Council looked to him to provide it with reliable information regarding the status of an important criminal investigation.  No ordinary citizen would have been in a similar position.  See Oberg v. City of Taunton, 972 F. Supp. 2d 174, 196 (D. Mass. 2013) (finding that plaintiff was speaking as a representative of the police department where his speech "was simply not the kind of activity engaged in by citizens who do not work for the police department").  Furthermore, his statements were based on information that he had gathered while carrying out his official duties to investigate crime.  Such information would not have been available to him outside the context of his employment.  See id. (finding that plaintiff's speech was not protected under the First Amendment where it "derived solely from his special knowledge obtained during the course of his investigation and therefore during the course of his employment").

To the extent Amirault contends that he was retaliated against for subsequent complaints that he made about City employees, this court finds that those statements too occurred in furtherance of his duties as head of the Detective Unit.  Thus, the plaintiff claims that after the City hired Blum-Shapiro to investigate whether additional funds were missing from the Building Department, he participated in discussions regarding the failure of City

employees to cooperate in the investigation.  (Compl. ¶¶ 25-27).  In particular, on June 8, 2015, Amirault allegedly attended a meeting with the City Solicitor, ADA Estes and the Forensic Auditor for the Middlesex District Attorney's Office, Mr. Ball, in order "to discuss Blum-Shapiro's inability to properly investigate whether additional funds had been stolen from the building department."  (Id. ¶ 26).  During the meeting, Amirault "expressed his objection to the conduct of the City of Malden Treasurer's office and the City's failure to produce the necessary permit records and payments" to Blum-Shapiro.  (Id. ¶ 27).  Again, Amirault's speech reflected knowledge that he had obtained in the course of carrying out his responsibilities for investigating crimes.  It also occurred in the context of a meeting among law enforcement and legal officials, rather than in a public forum.  "[T]here is no relevant analogue to speech by citizens who are not government employees."  Garcetti, 547 U.S. at 424, 126 S. Ct. at 1961.  An objective observer would have had the impression that Amirault was present in his capacity as head of the Detective Unit, and that he was representing the Police Department at the time he made his comments.

The same conclusion is warranted with respect to statements that Amirault made on October 6, 2015.  At that time, the plaintiff allegedly met with ADA Estes and Mr. Ball in order to show them records and information that he and other members of the Detective Unit had obtained from their review of Building Department documents.  (See id. ¶¶ 28-30).  Amirault claims that during that meeting, he "expressed his displeasure with the lack of cooperation and support provided by Malden City officials."  (Id. ¶ 30).  Again, Amirault's alleged statements were made in a meeting among officials at which the plaintiff presented information obtained from an official investigation.  His statements were not shared with the public, and there is no

indication that he was acting in any capacity other than in his role as head of the Detective Unit.

See Oberg, 972 F. Supp. 2d at 196 (where plaintiff spoke as a police chief "in the context of his

duties to investigate the background of existing or future members of the department and to

make recommendations regarding their continued employment[,]" he has "not plausibly

allege[d] that [he] spoke as a citizen").  Accordingly, this court finds that his statements were

made pursuant to his official duties to investigate crime within the City of Malden, and not in

his capacity as a citizen speaking on a matter of public concern.

The plaintiff argues that although his speech was made in connection with the

investigation of the Enos Henry matter, his complaints concerning the lack of cooperation by

City employees "did not specifically involve his [own] investigation."  (Pl. Opp. Mem. (Docket

No. 17) at 14).  As the plaintiff reasons, once the City hired Blum-Shapiro to investigate whether

additional funds had been stolen from the Building Department,

> [t]he responsibility of conducting that investigation was vested in an
> outside forensic auditing agency (Blum Shapiro), not the Malden Police
> Detective's Unit.  Thus, any subsequent speech by Plaintiff regarding the
> possible interference by City Officials in the auditing company's
> investigation resulting from the obvious delay and outright refusal to
> provide documentation was not a part of his job responsibilities.

(Id. at 14-15).

This court finds that the plaintiff's argument is insufficient to trigger the protections of

the First Amendment.  As an initial matter, his theory is undermined by his own factual allega-

tions.  In his Complaint, Amirault claims that Blum-Shapiro created a list of the documents

needed to determine whether additional funds had been stolen from the Building Department.

(Compl. ¶ 28).  City Solicitor Fallon then began to pull the records from the Building Department

herself, and Amirault, along with other members of the Detective Unit, engaged in a review and

analysis of those records.  (Id.).  Accordingly, the Complaint demonstrates that even after the

City hired Blum-Shapiro to investigate the theft of funds from the Building Department,

Amirault continued to take part in the investigation in his capacity as head of the Detective

Unit.  In fact, Amirault alleges that at the time he expressed frustration with City officials on

October 6, 2015, he was meeting with ADA Estes and Mr. Ball to show them records and

information from his own review of the Building Department documents.  (Id. ¶ 30).  Therefore,

the Complaint undermines Amirault's assertion that he was no longer responsible for

investigating the Enos Henry matter on behalf of the Malden Police Department.

In any event, the Complaint establishes that Amirault was not involved in "the kind of

activity engaged in by citizens who do not work for the government" at the time he engaged in

the alleged speech.  Garcetti, 547 U.S. at 423, 126 S. Ct. at 1961.  As described above, each of

his statements occurred in the context of meetings with other officials to report on or other-

wise discuss the status of a criminal investigation.  Such statements cannot be equated with

"public statements [made] outside the course of performing [one's] official duties."  Foley, 598

F.3d at 6 (quoting Garcetti, 547 U.S. at 423, 126 S. Ct. 1951) (alterations in original).  Conse-

quently, Amirault has not alleged that he spoke as a citizen with respect to the Enos Henry

matter.

As it relates to the YMCA investigation, Amirault's First Amendment claim arises out of

his August 3, 2015 meeting with a Norfolk County ADA and two individuals from the Norfolk

County C-PAC Unit of the Massachusetts State Police after responsibility for the matter was

transferred from Middlesex to Norfolk County.  (See Pl. Opp. Mem. at 15-16).  During the

meeting, Amirault and a second detective from the Malden Detective's Unit were asked

questions and provided the Norfolk County employees with all of the information they had

gathered from the YMCA investigation. (Compl. ¶ 62). The information allegedly "includ[ed]

the inconsistencies in the stories provided by Frank Molis and the sexual assault suspect." (Id.).

The Complaint establishes that Amirault was speaking in his capacity as head of the

Detective Unit at the time of the meeting on August 3, 2015. The information he provided was

obtained in the course of an official investigation of a sexual assault at the Malden YMCA, which

Amirault had conducted pursuant to his responsibilities for investigating significant crimes in

the City. There was no one in the room at the time of the alleged discussion other than

individuals who were responsible for investigating the incident and prosecuting the

perpetrator. Furthermore, the individuals from Norfolk County were looking to Amirault to

provide them with reliable information about the status of the investigation, and the subject

matter of the discussion was entirely related to Amirault's employment as a member of

Malden's Detective Unit. Under the circumstances, "his speech took on a degree of official

significance that has 'no relevant analogue to speech by citizens.'" Foley, 598 F.3d at 8 (quoting

Garcetti, 547 U.S. at 424, 126 S. Ct. 1951. Accordingly, the alleged circumstances warrant the

conclusion that he was speaking in his official capacity as a public employee.[2]

The plaintiff argues that his statements "were not a part of the specific YMCA sexual

assault investigation, but instead were directed to the independent investigation now in the

---

[2] To the extent Amirault contends that Molis retaliated against him for statements that he made to ADA Folger about the details of the YMCA investigation, his claim cannot survive the motion to dismiss. The Complaint demonstrates that his statements to ADA Folger were made in connection with his investigation, and in furtherance of his efforts to identify the perpetrator and to collect all of the relevant surveillance videotape from the date of the alleged sexual assault. (See Compl. ¶¶ 39, 60). It also indicates that his statements concerned the substance of the investigation. (Id.). Accordingly, the Complaint establishes that Amirault's statements were made in his official capacity as a detective.

hands of Norfolk County and not [the] Malden Police Department."  (Pl. Opp. Mem. at 15-16).

However, this does not support his claim that he engaged in protected speech.  While his

statements may not have been made in the course of his own investigation, he was still carrying

out his duties as a detective by providing relevant information to the individuals who were

tasked with taking over the investigation under circumstances which "imbued his speech with

the official significance that removed it from the protection of the First Amendment."  Foley,

598 F.3d at 10.  Accordingly, this court concludes that Amirault was not speaking as a citizen at

any relevant time, "and that he consequently has no First Amendment cause of action."  Id.

Count I of the Complaint will therefore be dismissed.

### C.      Count III: Claim Against Molis Under the MCRA

In Count III of his Complaint, Amirault is seeking to hold Molis liable under the MCRA for

violating his First Amendment rights.  Because this court finds that Amirault has failed to allege

a constitutional violation, or to allege facts showing that Molis retaliated against him using

threats, intimidation or coercion, the defendant's motion to dismiss is allowed with respect to

this claim as well.

"To state a claim under the MCRA,[3] a plaintiff must show that (1) his exercise or

enjoyment of rights secured by the constitution or laws of either the United States or the

---

[3]  The MCRA, Mass. Gen. Laws ch. 12, § 11H, provides in relevant part: "Whenever any person or persons, whether or not acting under color of law, interfere by threats, intimidation or coercion, or attempt to interfere by threats, intimidation or coercion, with the exercise or enjoyment by any other person or persons of rights secured by the constitution or laws of the United States, or of rights secured by the constitution or laws of the commonwealth, the attorney general may bring a civil action for injunctive or other appropriate equitable relief in order to protect the peaceable exercise or enjoyment of the right or rights secured."  Mass. Gen. Laws ch. 12, § 11I authorizes civil actions by any person who has suffered the interference or attempted interference of the right described in § 11H.

Commonwealth of Massachusetts (2) has been interfered with, or attempted to be interfered with, and (3) that the interference or attempted interference was by threats, intimidation or coercion." Farrah ex rel. Estate of Santana v. Gondella, 725 F. Supp. 2d 238, 247 (D. Mass. 2010) (footnote added).  "The purpose of the MCRA is to provide under state law a remedy 'coextensive with 42 U.S.C. § 1983, except that the Federal statute requires State action whereas its State counterpart does not.'" Id. (quoting Batchelder v. Allied Stores Corp., 393 Mass. 819, 822-23, 473 N.E.2d 1128, 1131 (1985)).  Furthermore, under the MCRA, but not 42 U.S.C. § 1983, the plaintiff must identify a federal or state right that has been "interfered with by threats, intimidation, or coercion." Flesner v. Tech. Commc'ns Corp., 410 Mass. 805, 818, 575 N.E.2d 1107, 1115 (1991)).  For the reasons described above, Amirault has failed to allege sufficient facts to show that Molis interfered with his constitutional rights. Therefore, his MCRA claim cannot be sustained.  See Willoughby v. Town of Tisbury, 750 F. Supp. 2d 374, 383 (D. Mass. 2010) (finding that plaintiffs' failure to establish that the defendants violated their constitutional rights warranted dismissal of their claim under the MCRA).

Even if Amirault had alleged a constitutional violation, he would not be able to maintain a claim against Molis under the MCRA because he has failed to allege that Molis interfered with his rights through the use of threats, intimidation or coercion.  Pursuant to the MCRA,

> "[a] 'threat' … involves the intentional exertion of pressure to make another fearful or apprehensive of injury or harm.  'Intimidation' involves putting in fear for the purpose of compelling or deterring conduct … ['Coercion' involves] the application to another of such force, either physical or moral, as to constrain [a person] to do against his will something he would not otherwise have done."

Farrah ex rel. Estate of Santana, 725 F. Supp. 2d at 247 (quoting Planned Parenthood League of Mass., Inc. v. Blake, 417 Mass. 467, 474, 631 N.E.2d 985 (1994)) (alterations in original).  Here,

27

Amirault alleges that Molis retaliated against him by transferring him from the Detective Unit to the Accreditation Manager position against his will and advising the plaintiff that he was to work on accreditation and "nothing else."  (See Compl. ¶¶ 63-66).  The plaintiff does not dispute that this conduct does not constitute a threat or intimidation.  (See Pl. Opp. Mem. at 17-19).  Nevertheless, he argues that Molis' decision to reassign him to the accreditation position involved economic coercion that is actionable under the MCRA.  For the reasons that follow, this court disagrees.

"Although there may be circumstances in which a showing of economic coercion, standing alone, may be actionable under the MCRA, almost all of the reported cases involve an element of physical force or confrontation."  Horne v. City of Boston, 509 F. Supp. 2d 97, 115 (D. Mass. 2007), and cases cited.  No such force or confrontation has been alleged in this case. Moreover, Amirault has not alleged that he was entitled to remain in the Detective Unit, or that his reassignment breached or otherwise interfered with a contractual right.  See Nolan v. CN8, 656 F.3d 71, 77 (1st Cir. 2011) (noting that in the employment context, "the Supreme Judicial Court's cases demonstrate . . . that some contractual entitlement to one's position is necessary, but not necessarily sufficient, to show that an employee's termination is coercive in the relevant sense").  Under such circumstances, he has not shown that his reassignment to the Accreditation Manager position was coercive within the meaning of the MCRA.  See id. at 78 (finding no coercion where employer had discretion to terminate plaintiff "for his campaign of public protest," and did not breach its contract or deprive plaintiff "of future economic gain to

which he was rightfully entitled").  Accordingly, he has failed to state a claim against Molis for

relief under the MCRA, and Count III of his Complaint must be dismissed.[4]

### IV.  CONCLUSION

For all the reasons detailed herein, the "Defendant Kevin Molis' Motion to Dismiss"

(Docket No. 13) is ALLOWED, and Counts I and III of the plaintiff's Complaint shall be dismissed.


/ s / Judith Gail Dein
Judith Gail Dein
United States Magistrate Judge

---

[4] In light of this court's conclusion that Amirault has failed to state a claim against Molis under either Section 1983 or the MCRA, it is not necessary to address the defendant's argument that he is entitled to qualified immunity.  (See Def. Mem. at 10-12).