UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| JOHN AMIRAULT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | CIVIL ACTION |
| | ) | NO.  16-10158-JGD |
| CITY OF MALDEN, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OF DECISION AND ORDER ON
## DEFENDANT CITY OF MALDEN'S MOTION FOR SUMMARY JUDGMENT

September 28, 2018

DEIN, U.S.M.J.

### I.  INTRODUCTION

The plaintiff, John Amirault ("Amirault" or "Plaintiff"), has been employed by the City of

Malden, Massachusetts (the "City"), for over 36 years, and as a law enforcement officer for

over 31 years.  At all relevant times, up until the present, he has held the rank of Captain.

Effective November 1, 2015, Amirault was involuntarily removed from his position as the Head

of the Department's Detective Unit, and was assigned to fill the Police Department's newly

created position of Manager of Accreditation.  Amirault claims that the reassignment took him

out of the mainstream of detective work and deprived him of the ability to earn overtime pay,

and that the job change was made in retaliation for statements he made during the course of

two investigations in which he uncovered evidence of possible misconduct by City officials.  As

described herein, these matters are known as the "Henry matter" and the "YMCA investiga-tion."

On March 20, 2017, this Court dismissed Counts I and III of Amirault's Complaint against Malden's Chief of Police, Kevin Molis, in which Amirault had purported to bring claims pursuant to 42 U.S.C. § 1983 and the Massachusetts Civil Rights Act, Mass. Gen. Laws ch. 12, § 11I, for violating his First Amendment right to free speech.  (Docket No. 35).  This matter is presently before the Court on "Defendant's Motion for Summary Judgment" (Docket No. 52), by which the City of Malden is seeking judgment on Count II of Plaintiff's Complaint in which he alleges that the City violated his rights under the Massachusetts Whistleblower Act, Mass. Gen. Laws ch. 149, § 185.  For the reasons detailed herein, the City's motion for summary judgment  is ALLOWED IN PART and DENIED IN PART.  Amirault may proceed on his whistleblower claims based on the Henry matter.  Summary judgment shall enter in favor of the City on Count II to the extent it relates to the YMCA investigation.

## II.  <u>STATEMENT OF FACTS</u>[1]

The following facts are undisputed unless otherwise indicated.

### <u>Overview</u>

Amirault has been employed by the Malden Police Department for over 30 years.  (DF ¶ 2).  In March 2013, Plaintiff, then a Captain, was assigned to serve as the Head of the Department's Detective Division.  (DF ¶¶ 4, 6; PF ¶ 147).  As the Head of the Detective Division,

---

[1] Unless otherwise indicated, the facts are derived from Defendant's Statement of Material Facts (Docket No. 54) ("DF"); the Declaration of Allison B. Cherundolo and the exhibits thereto (Docket No. 55) ("Def. Ex. __"); Plaintiff's Local Rule 56.1 Statement of Facts (Docket No. 65) ("PF"), which includes Plaintiff's Response to Defendant's Facts ("PR"); the Affidavit of Sheila E. McCravy and the exhibits thereto (Docket No. 64) ("Pl. Ex. __"); and Defendant's Reply to Plaintiff's Statement of Material Facts (Docket No. 68) ("DR").

Amirault had oversight over all major cases that occurred in the City of Malden.  (DF ¶ 7; PF ¶ 148).  In November 2014 and April 2015, he became involved in the investigation of two separate criminal matters, the "Henry matter" and the "YMCA investigation."  (DF ¶¶ 23, 75; PF ¶ 151).  On October 7, 2015, Plaintiff was informed that he would be transferred to the newly created position of Accreditation Manager.  (PF ¶ 227).  Plaintiff alleges that he was involuntarily transferred as retaliation for his involvement in the Henry matter and the YMCA investigation.  (See Compl. (Docket No. 1) at ¶¶ 76-79).  It is undisputed for purposes of this motion for summary judgment that the transfer to the position of Accreditation Manager was an adverse employment action as it represented a significant loss in pay and most officers "would not want to be assigned" to the position.  (PF ¶¶ 230-31; DR ¶¶ 230-31).

### The Henry Matter

On or about November 17, 2014, the Director of Malden's Planning, Inspections & Permits ("PIPS") Department , Chris Webb ("Director Webb"), reported that a city check had been stolen.  (DF ¶ 23).  Plaintiff claims that he was informed by Director Webb that the check was last seen on the desk of PIPS employee Enos Henry[2] and that the surveillance camera near Mr. Henry's office had been disconnected.  (PF ¶¶ 151, 159-60).  Director Webb also stated that Mr. Henry had worked in the City's IT department at the time the cameras were installed.  (PF ¶ 160).

---

[2]  Plaintiff notes that Mr. Henry is the son of Iodah Henry.  (PF ¶ 157).  An influential political figure, Iodah Henry serves on several political committees, including the City's Democratic Committee and the North Shore Black Women's Association, and has attended functions with the Mayor and Chief Molis. (PF ¶ 157; DF ¶ 31; DR ¶ 157).  The Plaintiff believes that Ms. Henry's status affected the way the Mayor handled the investigation of her son.  The Defendant denies this.

The check was discovered to have been cashed on November 8, 2014 by Jennifer Degand Rene.  (DF ¶ 25).  The Malden Police arrested Ms. Rene on February 2, 2015 and she implicated Mr. Henry in the theft of the check, stating that he had provided her with the check and agreed to pay her if she cashed it.  (DF ¶¶ 28-29; PF ¶ 162).

Given the fact that a City employee was implicated in the crime, Plaintiff contacted Chief Molis to brief him on the case.  (PF ¶ 163; DF ¶ 32).  Chief Molis and the Mayor of Malden, Gary Christenson, met with Amirault in Molis' police cruiser in the station garage.[3]  (PF ¶¶ 163-64; DF ¶¶ 35-36).  Plaintiff updated Chief Molis and the Mayor about the investigation.  (DF ¶¶ 36-37; PF ¶ 164).  Chief Molis asked Plaintiff several questions, but the nature of his questions and the Mayor's level of participation in the discussion are disputed.[4]  (PF ¶ 164; DR ¶ 164; DF ¶¶ 37-38; PR ¶¶ 37-38).

On February 3, 2015, Mr. Henry was brought in for questioning, and he ultimately confessed to violating PIPS protocols and knowing Ms. Rene.  (DF ¶ 39; PF ¶ 166).  The same day, Amirault met with City Solicitor Katherine Fallon, Director Webb, and the City's Personnel Director Eleanor Cushing.  They determined that there was "just cause" to terminate Mr. Henry and that Mr. Henry should also be issued a no trespass notice to prevent him from accessing City property.  (PF ¶¶ 167-69).  However, at the recommendation of the Mayor and Chief Molis,

---

[3] It is disputed as to whether or not Plaintiff requested the Mayor's presence at the meeting.  (PF ¶ 163; DR ¶ 163).  However, Plaintiff notes that the Mayor's presence was unusual, and believes that the inter-action is further circumstantial evidence of the peculiarity of the Henry matter.  (See PF ¶ 164).

[4] Plaintiff contends that Chief Molis asked probative questions about the strength of the case which Plaintiff described as "odd" because, in his experience, briefing the Chief of Police "did not involve ques-tions as to the strength or lack thereof of the evidence against the suspect."  (PF ¶¶ 164-65).  Plaintiff also asserts that once he began to discuss the case "Mayor Christenson expressed some surprise at the news stating "[R]eally? I thought that case was long gone."  (PF ¶ 164).  However, Defendant maintains that the Mayor "did not provide feedback pertaining to the investigation."  (DF ¶ 37).

Mr. Henry instead was suspended and issued a no trespass notice.  (PF ¶ 172; DF ¶¶ 41-42; Pl. Ex. Y).

On February 6, 2015, Director Webb reported that another City employee had been contacted by Mr. Henry in an attempt to smuggle checks back into the PIPS Department.  (DF ¶ 44; PF ¶ 173).  Based on this information the Malden Police conducted a search of Mr. Henry's home where they allegedly uncovered seventy-six additional checks totaling over $16,000.00.  (DF ¶ 46; PF ¶ 174).  While officers were executing the warrant, Mr. Henry was discovered attempting to remove or destroy evidence and was subsequently arrested.  (DF ¶ 47; PF ¶ 175).  Upon hearing of Mr. Henry's arrest, City Solicitor Fallon drafted a termination letter.  (PF ¶ 176).  The Mayor was allegedly upset over City Solicitor Fallon's unilateral actions, reportedly stating that he "did the hiring and firing, not her."  (Id. ¶ 178).  Together with his Chief of Staff, the Mayor rewrote the letter, terminating Mr. Henry's employment on or about February 11, 2015.  (DF ¶ 49; PF ¶¶ 177-80).

On February 10, 2015, Plaintiff appeared before the Malden City Council to discuss the allegations against Mr. Henry.  (PF ¶ 181; DF ¶ 50).  Afterward the Council approved an outside audit of the PIPS Department to be performed by the accounting firm BlumShapiro.  (PF ¶ 181; DF ¶ 53).  However, according to the Plaintiff, City personnel were uncooperative in the investigation, and he complained about their conduct.  For example, in order to complete the audit, BlumShapiro required a document known as the Energov Report.  (PF ¶ 182).  The Energov Report was to be completed by the head of the City's IT Department Anthony Rodriguez.  (Id.)  On February 26, 2015, BlumShapiro provided him with a recommended format for the report detailing the information sought.  (Id.).  Mr. Rodriguez was unfamiliar with

creating an Energov Report using the recommended format and suggested a conference call with BlumShapiro and the company that provided support for the City's Energov system.  (Id. ¶ 183).  He was tasked with setting up the call, but the call was never scheduled.  (Id.).

BlumShapiro personnel contacted Mr. Rodriguez requesting the report on March 31, 2015 and again on April 7, 2015 with no response.  (Id. ¶ 184).  On April 13, 2015, City Solicitor Fallon interceded, at which point Mr. Rodriguez produced two Excel spreadsheets with no identifying information.  (Id. ¶ 185).  When BlumShapiro personnel contacted Mr. Rodriguez for assistance interpreting the unlabeled data, he was unable to explain the information.  (Id.).  A workable Energov Report was eventually provided on April 21, 2015, but it contained incomplete information, making it impossible to complete a final audit.  (Id. ¶186).  However, with the information presented BlumShapiro was able to show several suspicious transactions involving Mr. Henry totaling close to $99,000.00.  (Id. ¶ 187).

In or around March 2015 and again on April 16, 2015, the District Attorney's office issued a Grand Jury subpoena related to the Henry matter in an effort to get the necessary information.  (DF ¶ 60; PF ¶ 189).  The City complied with the request, but City Solicitor Fallon informed Plaintiff that the information the City provided contained significant gaps in the data.  (DF ¶ 61; PF ¶ 190).

On or around June 8, 2015, Plaintiff and City Solicitor Fallon met with the prosecutor of Mr. Henry's case, Assistant District Attorney Craig Estes, and the Forensic Auditor for the Middlesex District Attorney's Office, Sean Ball, to discuss the lack of cooperation by the City.  (PF ¶ 188).  Plaintiff alleges that he continued to meet with the City Council as many as six times regarding the progress of the Henry matter, and to provide them with "reports which included

the lack of cooperation by City officials in providing requested information and the incomplete

nature of the documents submitted in response to the Grand Jury subpoena." (Id. ¶ 191).

According to the Plaintiff, on October 3, 2015, the Mayor approached the Plaintiff and

questioned him about the progress of the Henry matter.  (Id. ¶ 193).  Plaintiff informed the

Mayor that the investigation was progressing well, that an indictment was expected, and that

he would be meeting with the District Attorney regarding the case on October 6, 2015.  (Id.

¶ 193).

Chief Molis met with the president of the police union on October 5, 2015 to discuss

transferring Amirault to the Accreditation Manager position.  (Id. ¶ 220; DF ¶ 130).  Plaintiff

was informed of the transfer on October 7, 2015.  (PF ¶ 227; DF ¶ 134).

### The YMCA Investigation

On April 4, 2015, the police were notified that a six-year-old girl was reporting that she

had been sexually assaulted at the YMCA in Malden.  (DF ¶ 75).  Chief Molis' brother, Francis

Molis, was a supervisor at the YMCA and was at the facility on the day of the alleged assault.

(PF ¶ 194).  Certain areas of the YMCA are monitored by cameras, and after police officers

responded to the alleged assault, they reviewed the surveillance videotapes with Frank Molis in

the hope of identifying the assailant.  (PF ¶¶ 198-99; DF ¶ 80).  A review of the tapes revealed

an Asian male suspect.  (DF ¶ 81).  None of the YMCA employees, including Frank Molis,

indicated that they knew anything about the suspect on the videotape.  (PF ¶ 199).

Plaintiff received a copy of the surveillance video from Frank Molis and brought it to

Assistant District Attorney Katherine Folger ("ADA Folger") in order to assemble a Sexual

Assault Intervention Network ("SAIN") Team.  (DF ¶ 84).  Amirault spoke with ADA Folger about

[7]

sending a still photo from the videotapes to local media to assist in identifying the suspect.  (DF ¶ 86; PF ¶ 200).  When Amirault returned to the station, however, he contends that Chief Molis "appeared angry over the status of the case . . . [and] countermanded that decision stating that he preferred to 'work the case in house.'"  (PF ¶ 201).

On April 6, 2015, a detective went to the YMCA to interview witnesses, including Frank Molis.  (PF ¶ 202).  Without Plaintiff's knowledge, Chief Molis accompanied the detective to participate in the investigation.  (Id.).  Frank Molis and two front desk employees were interviewed.  (PF ¶ 204; DF ¶ 96).  Chief Molis participated in all three interviews and reviewed the video surveillance recording.  (PF ¶ 204).  Neither Frank Molis, nor any of the other witnesses, indicated knowing the suspect.  (Id.).  Later that night, one of the front desk employees sent Chief Molis a text message with the name of the suspect, which was promptly provided to the Plaintiff.  (DF ¶¶ 102-03; PF ¶ 205).

On April 7, 2015, the Plaintiff and Detective Marc Gatcomb brought the suspect in for questioning.  (PF ¶ 205; DF ¶¶ 106, 108).  Detective Gatcomb and Detective Robert DiSalvatore interviewed the suspect.  (DF ¶¶ 109).  During the interview, the suspect admitted to the alleged assault and claimed that Frank Molis had invited him to the YMCA on the day in question to help move furniture.  (Id. ¶¶ 109-10).  At this point the detectives took a short break to inform Amirault of the suspect's claim that he knew Frank Molis despite Frank Molis' previous statement to the contrary.  (DF ¶ 111; PF ¶ 208).  At Amirault's instruction, the detectives then returned to the interview to question the suspect about his relationship with Frank Molis.  (DF ¶ 112; PF ¶ 208).  In accordance with Department protocol, the interview was to be audio and video recorded.  (DF ¶ 115).  However, as the detectives began to question the

suspect about his relationship with Frank Molis, the recording was terminated from outside of the interview room.  (PF ¶ 209; DF ¶ 115).  This was the first known instance of a recording stopping in the middle of an interview.  (PF ¶ 212).

On April 24, 2015, Plaintiff contacted Frank Molis to request access to the YMCA servers in order to obtain surveillance footage from the incident on April 4, 2015.  (DF ¶ 119).  Frank Molis informed the Plaintiff that YMCA legal counsel would need to authorize release of the servers.  (PF ¶ 215; DF ¶ 121).  After contacting the YMCA attorney, the servers were released to the Police Department.  (DF ¶ 122; PF ¶ 216).

On July 14, 2015, the Plaintiff met with ADA Folger to discuss the YMCA Investigation, the conflicting statements regarding whether or not Frank Molis knew the suspect, and to express "his belief that Frank Molis was intentionally impeding the investigation."  (PF ¶ 217). The case was later transferred from the Middlesex District Attorney's Office to Norfolk County. (DF ¶ 123; PF ¶ 218).  This practice is routine for cases involving the family member of a Malden Police Officer.  (DF ¶ 124).

Amirault and Detective DiSalvatore met with a Norfolk County ADA and two members of the Massachusetts State Police for the Norfolk County C-PAC Unit to discuss the investigation. During this meeting Amirault informed them that he believed Frank Molis may have misled the investigation.  (PF ¶ 219; DF ¶ 126).

### Reassignment to Accreditation Manager

In 2013, the Mayor informed Chief Molis that he wanted to pursue accreditation for the Malden Police Department.  (DF ¶ 127).  On March 1, 2013, the Mayor and Amirault signed a Memorandum of Agreement altering the collective bargaining agreement that existed between

the City of Malden and the New England Police Benevolent Association.  (Def. Ex. J).  This memo explicitly granted the police chief "flexibility in assigning duties and responsibilities to a Captain . . . so that responsibilities involving grant writing, *police accreditation* and the technological advances of the department are adequately addressed."  (Id. (emphasis added)).  In May 2015, Chief Molis attended a chief's conference where someone from the Accreditation Commission gave a presentation on the accreditation process.  (DF ¶ 128).

On October 5, 2015, two days after Plaintiff's conversation with the Mayor regarding the Henry matter, Chief Molis met with Detective Gatcomb, the president of the union to which Plaintiff belonged.  (PF ¶ 220; DF ¶ 130).  During this meeting Chief Molis presented a "Notice of Contemplated Action" stating that he was "contemplating assigning Capt. John Amirault to a temporary assignment as [the Department's] Accreditation Project Manager."  (Pl. Ex. U).  The Notice further stipulated that Chief Molis was "contemplating assigning [Detective Gatcomb], as the Detective Lieutenant in the bureau, to temporarily serve as the commanding officer of the Detective Bureau."  (Id.).  During the meeting Detective Gatcomb questioned Chief Molis as to whether the action was still contemplated or if it had already been decided and Chief Molis responded that the decision had been made.  (Pl. Ex. N at 52)

At this time, Detective Gatcomb held the rank of Lieutenant.  (PF ¶ 225).  At no point prior to this incident had the Head of the Detective Unit held a rank other than Captain.  (Id.).  Additionally, at no point prior to this incident had a Captain assigned as Head of the Detective Unit been removed for non-disciplinary reasons.  (Id. ¶ 153).

Defendant claims that the Mayor has "no involvement with the Police Department's personnel decisions, including how personnel are assigned within the Department," and that

Complaint on February 2, 2016.  (Id. ¶ 145).  Two years after the filing of the Complaint, Plaintiff

remains in the temporary Accreditation Manager position and the Henry matter remains

pending.  (PF ¶ 233).

Additional facts will be provided below as appropriate.

### III.  ANALYSIS

### A.    Standard of Review – Summary Judgment

"The role of summary judgment is 'to pierce the pleadings and to assess the proof in

order to see whether there is a genuine need for trial.'"  PC Interiors, Ltd. v. J. Tucci Constr. Co.,

794 F. Supp. 2d 274, 275 (D. Mass. 2011) (quoting Mesnick v. Gen. Elec. Co., 950 F.2d 816, 822

(1st Cir. 1991)) (additional citation omitted).  The burden is upon the moving party to show,

based upon the discovery and disclosure materials on file, and any affidavits, "that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law."  Fed. R. Civ. P. 56(a).  "[A]n issue is 'genuine' if it 'may reasonably be resolved in favor of

either party.'"  Vineberg v. Bissonnette, 548 F.3d 50, 56 (1st Cir. 2008) (quoting Garside v. Osco

Drug, Inc., 895 F.2d 46, 48 (1st Cir. 1990)).  "A fact is 'material' only if it possesses the capacity

to sway the outcome of the litigation under the applicable law."  Id. (quotations, punctuation,

and citations omitted).

"Once the moving party has satisfied its burden, the burden shifts to the non-moving

party to set forth specific facts showing that there is a genuine, triable issue."  PC Interiors, Ltd.,

794 F. Supp. 2d at 275.  The opposing party can avoid summary judgment only by providing

properly supported evidence of disputed material facts.  LeBlanc v. Great Am. Ins. Co., 6 F.3d

836, 841-42 (1st Cir. 1993).  Accordingly, "the nonmoving party 'may not rest upon mere

allegation or denials of his pleading[,]'" but must set forth specific facts showing that there is a genuine issue for trial.  Id.  (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256, 106 S. Ct. 2505, 2514, 91 L. Ed. 2d 202 (1986)).  The court affords "no evidentiary weight to conclusory allegations, empty rhetoric, unsupported speculation, or evidence which, in the aggregate, is less than significantly probative."  Tropigas de P.R., Inc. v. Certain Underwriters at Lloyd's of London, 637 F.3d 53, 56 (1st Cir. 2011) (internal quotation marks and citation omitted).  Rather, "[w]here, as here, the nonmovant bears the burden of proof on the dispositive issue, it must point to 'competent evidence' and 'specific facts' to stave off summary judgment."  Id.  (citation omitted).

Applying these principles to the instant case compels the conclusion that the defendants' motion for summary judgment must be ALLOWED IN PART AND DENIED IN PART.

**B.**      **Elements of a Whistleblower Retaliation Claim**

The Massachusetts Whistleblower statute provides in relevant part that:

> (b) An employer shall not take any retaliatory action against an employee because the employee does any of the following:
>
> > (1)  Discloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer, or of another employer with whom the employee's employer has a business relationship, that the employee reasonably believes is in violation of a law, or a rule or regulation promulgated pursuant to law, or which the employee reasonably believes poses a risk to public health, safety or the environment;
> > ....
> > (3)  Objects to, or refuses to participate in any activity, policy or practice which the employee reasonably believes is in violation of a law, or a rule or regulation promulgated pursuant to law, or which the employee reasonably believes poses a risk to public health, safety or the environment.

Mass. Gen. Laws ch. 149, § 185(b)(1)-( 3).  "Retaliatory action" is defined as "the discharge, suspension or demotion of an employee, or other adverse employment action taken against an employee in the terms and conditions of employment."  Mass. Gen. Laws ch. 149, § 185(a)(5). The City has conceded, for purposes of the motion for summary judgment, that Amirault's removal as Head of the Detective Unit, and his transfer to Accreditation constitutes an adverse employment action under the statute.  (Def. Mem. (Docket No. 53) at 6 n.3).

A claim proceeding under the Massachusetts Whistleblower Act is analyzed under a burden-shifting analysis. Once the employee has presented a prima facie case, the employer "may subsequently avoid liability 'by proffering a legitimate, nonretaliatory reason for the adverse action.'"  Pierce v. Cotuit Fire Dist., 741 F.3d 295, 303 (1st Cir. 2014) (quoting Higgins v. New Balance Athletic Shoe, Inc., 194 F.3d 252, 262 (1st Cir. 1999)).  Once this has been shown, the ultimate burden rests with the employee to show that the employer's reason is pretextual and that a "retaliatory animus sparked" the adverse action.  Id.

In order to make out a prima facie claim under the Whistleblower Act, "an employee must show 'that he engaged in protected activity and that his participation in that activity played a substantial or motivating part in the retaliatory action.'"  Id. (quoting Welch v. Ciampa, 542 F.3d 927, 943 (1st Cir. 2008)).  The plaintiff does not need to prove that any illegal conduct was actually taking place, it is sufficient if the employee had a reasonable belief that such illegal conduct was occurring.  See Mello v. Stop & Shop Cos., 402 Mass. 555, 560 n. 6, 524 N.E.2d 105, 108 n.6 (1988) (assuming in dicta that "whistleblowing based on a reasonable, good faith (but erroneous) belief that the employer is violating the law should be protected . . . .").  On the other hand, the plaintiff must provide competent evidence that the employer was aware that

[14]

the plaintiff was engaging in protected activity, since "one cannot have been motivated to

retaliate by something he was unaware of[.]" Delaney v. Town of Abington, 890 F.3d 1, 6 (1st

Cir. 2018) (quoting Medina-Rivera v. MVM, Inc., 713 F.3d 132, 139 (1st Cir. 2013)).  Thus, "[t]o

succeed on his claim under the Whistleblower Act, [Amirault] must show that he engaged in

protected activity of which the employer was aware, that he suffered an adverse employment

action, and that there was a causal connection between the protected activity and the adverse

action." Gauthier v. Town of Dracut, 19 Mass. L. Rptr. 579, 2005 WL 1669121, *3 (Mass. Super.

Ct. June 27, 2005) (citing Lipchitz v. Raytheon Co., 434 Mass. 493, 502, 751 N.E. 2d 360, 368

(2001)).  As detailed below, Amirault has put forth sufficient evidence to create a genuine issue

for trial with respect to the Henry matter, but not the YMCA investigation.  See Lewis v. Gillette,

Co., 22 F.3d 22, 24 (1st Cir. 1994) ("When the non-moving party bears the burden of persuasion

at trial, however, to avoid summary judgment he must make a 'showing sufficient to establish

the existence of the elements essential to his case.'") (quoting Celotex Corp. v. Catrett, 477 U.S.

317, 322-23, 106 S. Ct. 2548, 2552-53, 91 L. Ed. 2d 265 (1986)).

### C.    The Henry Matter

In connection with the Henry matter, Amirault contends that he engaged in protected

activity in connection with his meetings with the Malden City Council, the June 8, 2015 meeting

with Assistant District Attorney Craig Estes and Forensic Auditor Sean Ball, and his general

involvement with the Henry investigation.  While the Defendant does not dispute that this

conduct is protected activity,[6] the City contends that Amirault cannot establish that there is a

---

[6] It is uncontested that Chief Molis and the Mayor were aware of Plaintiff's meetings with the Malden
City Council.  It is also uncontested that at these meetings Plaintiff provided reports to the City Council
about the Henry Matter and the "lack of cooperation by *City officials* in providing requested information

causal connection between the protected activity and the adverse action.  See Welch, 542 F.3d at 943 ("In order to prevail on a claim under the whistleblower statute, a plaintiff must show that he engaged in protected activity and that his participation in that activity played a substantial or motivating part of the retaliatory action.").  Further, the City contends that even if a causal connection was established, the Plaintiff cannot establish that the Accreditation assignment was pretextual, or that the Defendant acted with retaliatory animus.  For the reasons detailed herein, this Court concludes that Amirault has put forward sufficient evidence to survive the summary judgment challenge.

A plaintiff can show that the protected conduct and retaliatory action are causally connected in many ways, including but not limited to, "differential treatment in the workplace . . . temporal proximity of an employee's protected activity to an employer's adverse action . . . or comments by the employer which intimate a retaliatory mindset."  Ortiz v. Federal Bureau of Prisons, 290 F. Supp. 3d 96, 107 (D. Mass 2017) (quoting Mesnick v. General Electric Co., 950 F.2d 816, 828 (1st Cir. 1991)).  As an initial matter, the City argues that Amirault's removal as Head of the Detective Unit and reassignment as the Accreditation Manager was too remote in time from his efforts on the Henry matter for a fact-finder to infer that they were causally related.  To reach this conclusion, however, the City misconstrues the factual record.

The City argues that Plaintiff's appearances before the City Council occurred in February 2015, the investigation took place over the Spring of that year, and "Plaintiff's temporary

_____

and the incomplete nature of the documents submitted in response to the Grand Jury subpoena."  (PF ¶ 191 (emphasis added)).  A jury could find, for example, that these reports constitute a protected activity insofar as Plaintiff was disclosing to a public body (the City Council) conduct which he reasonably believed violated the law (obstruction and theft) perpetrated by his employer (the City of Malden).

reassignment became effective on November 1, 2015." (Def. Mem. at 7). The precise dates of the Plaintiff's meetings with the City Council are unclear, but there is substantial evidence in the record that Amirault's involvement continued up until the time of his reassignment. As described above, according to the Defendant, Chief Molis assured the City Council and the Assistant District Attorney pursuing Mr. Henry's case after Amirault's reassignment to inform them that Plaintiff's reassignment would not impact the investigation and that Plaintiff was available if needed. (DF ¶ 143). Similarly, City Solicitor Fallon was concerned that the reassign-ment was in retaliation for Amirault's involvement in the Henry matter. (PF ¶ 232). Significant-ly, on October 3, 2015, just days before the reassignment, the Mayor asked Amirault about the status of the Henry matter, and was told that an indictment was expected. (PF ¶ 193). While the Defendant disputes the significance of this conversation (Def. Mem. at 9), it should be up to a fact-finder to determine if the Henry matter was still very much on Chief Molis' and the Mayor's mind when the decision was made in early October (not November 1, 2015) to reassign Amirault. The reassignment was not so remote from Amirault's involvement in the Henry matter that this Court can conclude, as a matter of law, that the Plaintiff cannot establish causation. See DeCaire v. Mukasey, 530 F.3d 1, 19 (1st Cir. 2008) ("our law is that temporal proximity alone can suffice to 'meet the relatively light burden of establishing a prima facie case of retaliation.'" (quoting Mariani-Colon v. Dep't of Homeland Sec. ex rel. Chertoff, 511 F.3d 216, 224 (1st Cir. 2007))).

Moreover, the Plaintiff has proffered additional evidence which would support a finding of causation. The "ultimate issue" is "whether, viewing the aggregate package of proof offered by the plaintiff and taking all inferences in the plaintiff's favor, the plaintiff has raised a genuine

issue of fact" as to whether the adverse job action was causally related to his involvement in

the Henry matter.  Dominguez-Cruz v. Suttle Caribe, Inc., 202 F.3d 424, 431 (1st Cir. 2000) (in-

ternal quotations and citations omitted).  Here, the Plaintiff has established that he vigorously

pursued the Henry matter despite resistance from other City departments.  The Plaintiff argues,

and a fact-finder may conclude, that the Mayor, himself, was interested in the matter and was

inclined to support Mr. Henry (or terminate the investigation), as evidenced by his actions in

reversing the initial decision to terminate Henry's employment with the City.  (See PF ¶¶ 167-

69, 172; DF ¶¶ 41-42).  Moreover, the Mayor met with the Plaintiff in Chief Molis' car on

February 2, 2015, and Amirault contends that he had been unaware that the Mayor would be

there.  (PF ¶ 163).  This encounter may be viewed by a fact-finder as an effort by the Mayor to

privately learn about the Henry matter.  (See PF ¶¶ 163-64; DF ¶¶ 35-36; note 4, supra).

Similarly, the Mayor's October 3, 2015 conversation with Amirault reflects a continuing interest

on the part of the Mayor in the Henry matter.  (PF ¶ 193).  The Plaintiff argues that Henry had

been promoted to his position by the Mayor, and that Henry's mother was an influential

supporter of the Mayor, facts which could also support the conclusion that the Mayor would

want to stop the Henry investigation and that removing Amirault as Head of Detectives and

isolating him from police work as the Accreditation Manager was retaliatory.  (See generally Pl.

Mem. (Docket No. 63) at 14-16).

The City argues that there is no evidence that the Mayor was involved in or aware of

Chief Molis' decision to reassign Amirault.  Again, however, there is evidence from which a fact-

finder may find to the contrary.  Thus, the record establishes that Chief Molis provided the

Mayor with a copy of the October 5, 2015 Notice documenting the reassignment, which Chief

Molis had given to Detective Gatcomb.  (PF ¶ 221).  Thus, the Mayor knew about the reassign-

ment even before Amirault.  (PF ¶¶ 224, 227).  The Plaintiff argues that "Chief Molis had never

before informed Mayor Christenson of a contemplated re-assignment within the Department

prior to this time."  (Pl. Mem. at 15; <u>see</u> DF ¶ 139 ("The Mayor has no involvement with the

Police Department's personnel decisions, including how personnel are assigned within the

Department.").  Under such circumstances, there is sufficient evidence to support a finding of

causation so that the City's motion for summary judgment must be denied.

Finally, the City argues that Amirault cannot establish that its stated reason for

transferring him to be in charge of the accreditation process was pretextual.  Thus, the City

argues that accreditation was a legitimate goal of the Department, and that "Chief Molis

selected the Plaintiff to be the Accreditation Manager because of his well-rounded tenure with

the Department, including his experience as patrol commander, Union leader, a member of the

detail board, and a leader in the Detective Division" – factors which allegedly led Chief Molis to

conclude that Amirault was the best suited for the position.  (Def. Mem. at 12-13 (citing DF

¶ 131)).  However, the Plaintiff has raised sufficient questions about the validity of the reason

given for his reassignment so that the issue should be decided by a jury.

While the Mayor allegedly informed Chief Molis that he wanted to pursue accreditation

for the Department in 2013, Chief Molis apparently did not do anything in furtherance of that

goal until May 2015, when he attended a conference where there was a presentation from the

Accreditation Commission.  (DF ¶¶ 127-28).  Even then, although he was apparently in frequent

contact with Amirault, he never communicated with him either about the accreditation process

or his potential role as Manager.  The Chief did not even provide Amirault with a copy of the

Notice proposing to change his position, electing instead to provide the information to the

Union.  (PF ¶ 220; DF ¶ 130).  The jury can consider such evidence in deciding whether the

reassignment was a straightforward business decision, or done in retaliation for pursuing an

investigation that was causing the City discomfort.  See McDonough v. City of Quincy, 452 F.3d

8, 18 (1st Cir. 2006) (finding the fact that the police chief did not discuss a plan to restructure

the department with captains during a management meeting sufficient to undermine the City's

contention that a transfer decision was part of a systemic restructuring process).

Moreover, the record before the Court is that Amirault was performing his role as the

Head of Detectives well, and was respected by members of his Unit.  (PF ¶ 150).  Historically,

the Detective's Unit was headed by a Captain (PF ¶ 225), and a Captain assigned as the Head of

the Unit would be removed only for disciplinary reasons.  (PF ¶ 153).  Nevertheless, Amirault

was allegedly not being disciplined, and Gatcomb, a Lieutenant, was assigned to replace

Amirault as the Head of the Unit.  (PF ¶ 225).  Where an "adverse action is taken against a

satisfactorily performing employee in the immediate aftermath of the employer's becoming

aware of the employee's protected activity, an inference of causation is permissible."  Mole v.

Univ. of Mass., 442 Mass. 582, 592, 814 N.E.2d 329, 339 (2004).  As Amirault argues:

> By Chief Molis' own admission, removing a Captain from the Detective's Unit
> for any reason other than discipline would be a "rare occurrence."  Despite
> this, Chief Molis provides no explanation for his decision to remove Plaintiff
> from the Detective's Unit except that he felt Plaintiff was "well-rounded."
> There were three additional Captains that Chief Molis could have assigned to
> accreditation.  However, he chose Plaintiff who was in the midst of a serious
> investigation involving the theft of City funds that was about to culminate in
> an indictment.  There was no reasonable basis to do so.  As City Solicitor
> Fallon told the City Council, it just doesn't make sense.  [PF] ¶ 232.  Further-
> more, since Plaintiff's removal from the Detectives Unit, there has been no
> additional investigation into either the Henry matter or the YMCA matter.  Id.
> ¶ 233.  It is clear from this evidence a jury could reasonably conclude that

[20]

> Chief Molis' removal of Plaintiff from the Detectives Unit was merely pretextual and the true nature of his actions was retaliation for protect[ed] activity under the Whistleblower Act.

(Pl. Mem. at 17).   In order to defeat any employer's business explanation at this stage of a case, "[t]he plaintiff does not have to prove by a preponderance of the additional evidence that discrimination was in fact the motive for the action taken.   All a plaintiff has to do is raise a genuine issue of fact as to whether discrimination motivated the adverse employment action." Dominguez-Cruz, 202 F.3d at 434 (quoting Olivera v. Nestle P.R., Inc., 922 F.2d 43, 50 (1st Cir. 1990)).   A jury can find pretext where "the employer's proffered explanation is unworthy of credence[.]"   McDonough, 452 F.3d at 18 (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000)).   Amirault has raised a genuine issue of fact so that summary judgment based on the Henry investigation is denied.

### D.   The YMCA Investigation

For the reasons detailed herein, Amirault's whistleblower claim based on his role in the YMCA investigation fails as a matter of law.[7]   Specifically, Amirault contends that he engaged in protected activity in connection with his meetings with the District Attorney's Office.   However, the Plaintiff's statement of facts establishes that he did not raise any complaints about any actions of his employer or Chief Molis in those discussions – he just complained about Frank Molis.   Moreover, he has not alleged that the City or Chief Molis were aware of his discussions with the District Attorney's Office.   These facts preclude Amirault's claim under the Whistle-blower Act.

---

[7]  Nothing herein constitutes a ruling as to whether the events regarding the YMCA investigation would be otherwise admissible at trial.  This ruling is limited to a holding that the Whistleblower claim cannot be based on the YMCA investigation.

According to the Plaintiff:

> On July 14, 2015, Plaintiff met with ADA Folger in order to request that the District Attorney's Office's processing of the video obtained from Molis be expedited.  He also informed ADA Folger of the conflicting statements by the suspect and Frank Molis as to whether the two knew each other prior to the February 2015 assault and his belief that Frank Molis was intentionally impeding the investigation.

(PF ¶ 217).

> On August 3, 2105, Amirault and DiSalvatore met with one of the Norfolk County ADAs and two members of the Massachusetts State Police for the Norfolk County C-PAC Unit in order to provide them with all of the information they had gathered in the course of the YMCA investigation.  This included information about the inconsistencies in the statements that had been made by Frank Molis and the sexual assault suspect.

(PF ¶ 219).

In order to constitute protected activity Plaintiff must be disclosing "to a public body an activity, policy or practice *of the employer* . . . that the employee reasonably believes is in violation of a law . . . ."  Mass. Gen. Laws ch. 149, § 185(b)(1) (emphasis added).  Thus, the Plaintiff's complaints about Frank Molis do not qualify as protected activities.  Moreover, there are no allegations that any City official was aware of his meeting with the ADAs.  The absence of any evidence that the alleged retaliators knew of Amirault's protected activity defeats his claim.  See Alvarado v. Donahoe, 687 F.3d 453, 459 (1st Cir. 2012) (if the retaliator "is unaware of the fact that a plaintiff engaged in protected conduct, any actions attributable to him could not plausibly have been induced by retaliatory motives.").

IV. **CONCLUSION**

For all the reasons detailed herein, the "Defendant's Motion for Summary Judgment"

(Docket No. 52) is ALLOWED to the extent that the Whistleblower Act claim is based on the

YMCA investigation, but DENIED to the extent that the claim is based on the Henry matter.

/ s / Judith Gail Dein
Judith Gail Dein
United States Magistrate Judge